**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| **MALIKIE INNOVATIONS LTD. AND KEY PATENT INNOVATIONS LTD.,**<br><br>Plaintiffs,<br>**v.**<br><br>**GENERAL MOTORS LLC,**<br><br>Defendant. | Case No. 4:26-cv-14392<br><br>Jury Trial Demanded |

## **ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs Malikie Innovations Ltd. ("Malikie") and Key Patent Innovations Ltd. ("KPI") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Original Complaint for patent infringement against Defendant General Motors LLC ("General Motors," "GM," or "Defendant"), alleging as follows:

## **BACKGROUND AND NATURE OF THE SUIT**

1. This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This case asserts infringement of United States Patent Nos. 8,463,424 ("the '424 Patent"), 9,417,077 ("the '077 Patent"), 8,503,936 ("the '936 Patent"), 8,781,451 ("the '451 Patent"), RE48,212 ("the '212 Patent"), 7,917,829 ("the '829 Patent"), and 8,291,289 ("the '289 Patent") (collectively, "the Patents-in-Suit").

2. Plaintiff Malikie is the successor-in-interest to a substantial patent portfolio created and procured over many years by BlackBerry Ltd., formerly known as Research in Motion Ltd., and its predecessor, subsidiary, and affiliated companies (collectively, "BlackBerry"). This portfolio of approximately 32,000 patents "relates to a multitude of key technologies, for example, wireless, security, messaging and server technologies and comprises both Standard Essential Patents (SEPs) and non-SEPs. These technologies have been adopted by many of the world's leading technology companies and are the embedded backbone of products spanning industries including consumer electronics, automotive, enterprise cloud, medical devices, cybersecurity, AI/ML and many others." https://www.malikieinnovations.ie/. The portfolio reflects billions of dollars in research and development investment and decades of pioneering research in these key technologies. *Id.* Malikie's patents encompass "multi award-winning developments and are unrivaled for their solutions enabling reliability and security across a vast range of applications from mobile devices to secure enterprise servers." *Id.*

3. BlackBerry "is a mobile communications company. Founded in 1984 by Mike Lazaridis and Doug Fregin in Waterloo, Ontario, the company released its first device — a pager capable of email — in 1999. Following the release of its first smartphone in 2002, BlackBerrys quickly became must-have pieces of technology,

first among business people and later the general public . . . . Today, BlackBerry is credited with putting Waterloo on the map as an innovation hub." https://thecanadianencyclopedia.ca/en/article/blackberry-limited.

**THE PARTIES**

4. Plaintiff Malikie is an Irish entity duly organized and existing under the laws of Ireland. Malikie has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

5. Plaintiff KPI is the beneficiary of a trust pursuant to which Malikie owns, holds, and asserts the Patents-in-Suit. KPI is an Irish entity duly organized and existing under the laws of Ireland. KPI has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

6. Defendant General Motors is a Delaware limited liability company with its headquarters at 1240 Woodward Ave, Detroit, Michigan 48226. On information and belief, General Motors is responsible for research and development, design, manufacturing, offers for sale, marketing, importation, and distribution of automotive vehicles from GM-managed brands (e.g., Chevrolet, GMC, Buick, and Cadillac) in the United States, including this District.

7. General Motors is engaged in making, using, offering for sale, selling and/or importing vehicles to and throughout the United States, including this

District, having infotainment systems with navigation, driver assist, and/or multimedia device integration capabilities (the “Accused Products”).

## JURISDICTION AND VENUE

8. This action arises under the patent laws of the United States, 35 U.S.C. § 101, et seq. This Court’s jurisdiction over this action is proper under the above statutes, including 35 U.S.C. § 271, et seq., 28 U.S.C. § 1331 (federal question jurisdiction), and § 1338 (jurisdiction over patent actions).

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

10. Venue is proper for Defendant in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400(b).

11. General Motors has several regular and established places of business in this District, including at least its facilities located at 3100 Van Slyke Rd, Flint, Michigan 48507; 2100 Bristol Rd, Flint, Michigan 48552; 3406 S Dye Rd, Flint, Michigan 48507; 425 Stevenson St, Flint, Michigan 48503; 4420 Davison Rd, Burton, Michigan 48509; and 10800 S Saginaw St, Grand Blanc, Michigan 48439.

12. As discussed in detail herein, Defendant has infringed (literally and/or under the doctrine of equivalents), directly, indirectly, and/or through subsidiaries, agents, representatives, or intermediaries, one or more claims of each of the Patents-in-Suit by (1) making, using, selling, offering for sale, and/or importing into the

United States GM vehicles and mobile applications with the features described in the charts attached hereto as Exhibits 8-15 (collectively the "Accused Instrumentalities"), and (2) inducing others to infringe each of the Patents-in-Suit.

13. Through offers to sell, sales, imports, distributions, and other related agreements to transfer ownership of Defendant's Accused Instrumentalities by and/or to affiliates, distributors, subsidiaries, suppliers, retail partners, customers, and/or agents, Defendant is operating in (and has operated in) and maintaining (and has maintained) a significant business presence in the U.S. and/or through its U.S. subsidiaries or agents, Defendant does business in the U.S., the state of Michigan, and in the Eastern District of Michigan.

14. On information and belief, Defendant places, has placed, and contributes to placing Accused Instrumentalities into the stream of commerce via an established distribution channel knowing or understanding that such products would be sold and used in the United States, including in this judicial district. On information and belief, Defendant has also derived substantial revenues from infringing acts in this District, including from the sale and use of the Accused Instrumentalities.

15. Defendant is subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the Michigan Long Arm Statute because, *inter alia*, (i) Defendant has done and continues to do business in Michigan and (ii)

Defendant has, directly and through intermediaries, committed and continues to commit acts of patent infringement in the State of Michigan, including making, using, offering to sell, and/or selling Accused Instrumentalities in Michigan, and/or importing Accused Instrumentalities into Michigan, either directly or vicariously, inducing others to commit acts of patent infringement in Michigan, and/or committing at least a portion of any other infringements alleged herein. Defendant has placed, and continues to place, infringing products into the stream of commerce, via established distribution channels, with the knowledge and/or understanding that such products are sold in Michigan, including in this District. Defendant has derived substantial revenues from its infringing acts occurring within Michigan and within this District. Defendant has substantial business in this State and judicial district, including: (a) at least part of its infringing activities alleged herein; and (b) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from infringing goods offered for sale, sold, and imported, and services provided to Michigan residents vicariously through and/or in concert with its alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, and/or consumers.

16. Exercising personal jurisdiction over Defendant in this District would not be unreasonable given Defendant's contacts in this District, the interest in this

District of resolving disputes related to products sold herein, and the harm that would occur to Plaintiffs.

17. In addition, Defendant has knowingly induced infringement within this District by advertising, marketing, offering for sale, selling, testing, demonstrating, and/or otherwise encouraging use of infringing products within this District to consumers and providing instructions, user manuals, demonstrations, test drives, advertising, and/or marketing materials which facilitate, direct, or encourage the use of infringing functionality with knowledge thereof.

18. Personal jurisdiction also exists specifically over Defendant because it transacts business in this State or purposefully directed at this State (including, without limitation, retail stores) by making, importing, offering to sell, selling, and/or having sold infringing products within this State and District or purposefully directed at this State or District.

## THE PATENTS-IN-SUIT

### The ’424 Patent

19. The ’424 Patent, entitled “System and method for displaying address information on a map,” duly and legally issued on June 11, 2013, from U.S. Patent Application No. 11/936,455, filed on November 7, 2007, naming Ronald Dicke as the inventor. A copy of the ’424 Patent is attached hereto as Exhibit 1.

20. The ’424 Patent claims are not directed to an abstract idea, contain inventive concepts, and are directed to patent-eligible subject matter and are therefore patent eligible under 35 U.S.C. § 101.

21. The ’424 Patent claims are directed to more than merely displaying address information. The ’424 Patent disclosure makes clear that the disclosed and claimed inventions represent specific, technical solutions and advantages to shortcomings in the prior art.

22. As explained in the ’424 Patent, “[a]lthough street names and points of interest help a user navigate, it would be highly desirable to provide more detail about the device’s current position to further facilitate navigation.” Ex. 1, ’424 Patent, 1:41-44.

23. The ’424 Patent goes on to state that “[t]he present technology addresses a technical problem recognized by the applicant regarding the inadequacy of current navigation technologies. In particular, the applicant has observed that the graphical current position indicator on a map sometimes conveys an inadequate sense of position to the user, particularly in situations where the user wishes to know the street address corresponding to his or her current position . . . . [I]t is often difficult for the user to know with precision where he or she is located along a given street, boulevard or highway . . . . A further, yet related, problem recognized by the applicant is that it is often difficult for the user to see street numbers on passing

dwellings and buildings, a problem that is particularly acute at night when street numbers on dwellings and buildings along the roadways are obscured by darkness. Even in daylight, street numbers can be difficult to read from heavy or fast-moving traffic, particularly where buildings or dwellings are set back far from the roadway. This problem is also solved by presenting address information, for example, in the form of street numbers beside the graphical current position indicator on the map." *Id*. at 2:48-3:30.

24. The '424 Patent's disclosure and claims address this problem via a specific, system and multi-step process that, based on tracking the position of a mobile device, (1) receives current position information of the mobile device, (2) displays the current position of the mobile device on a map, (3) determines address information corresponding to the current position of the mobile device, and (4) presents the address information via a user interface of the mobile device by displaying a street number on the map adjacent to the graphical current position indicator. *Id*. at claims 1, 8, 10.

25. The '424 Patent claims include inventive concepts and provide improvements over existing methods for determining and presenting navigational displays.

26. The subject matter claimed by the ’424 Patent claims was not well-understood, routine, and conventional to those of skill in the art as of the ’424 Patent’s priority date—i.e., November 7, 2007.

27. To the extent any of the functionality claimed in the ’424 Patent claims was known before November 2007, merely being “known” does not render something “well-understood, routine, and conventional” to a person of ordinary skill in the art. Further, the claimed combination of features and functionalities was not well-understood, routine, and conventional before the November 2007 period.

28. Articles published after the ’424 Patent’s priority date, i.e., at least as early as November 2007, demonstrate that the ’424 Patent claims are not directed to technology that was well-understood, routine, and conventional to one of ordinary skill in the art in the November 2007 time period. For example, in 2008, Garmin products did not have the capability to present on a map in real-time, address information corresponding to a user’s current position as the user navigated a route. *See, e.g.*, Ex. 16, https://www.garmin.com/en-US/newsroom/press-release/automotive/2008-garminr-introduces-nuvir-7x5-series-with-lane-assist-giving-drivers-a-clear-picture-of-the-road-ahead (Garmin introduces new products with its new “Where Am I?” feature that “enable[d] drivers to look up their exact location including nearest address and intersection”); Ex. 1, ’424 Patent, 3:10-19 (“The only prior art GPS navigation unit known to the applicant that provides

anything related to street addresses is the Garmin™ StreetPilot c330 Automotive GPS which displays static street numbers, for example at an intersection of a boulevard. However, these static numbers do not identify the street address corresponding to the current position. Therefore, the Garmin™ technology would not assist a user who wishes to know the street address corresponding to his present location."). Similarly, in 2009, TomTom introduced its own "Where am I?" feature that provided users with their "current location, longitude and latitude, and nearest intersections." Ex. 17, https://www.cnet.com/reviews/tomtom-one-125-review.

29. As discussed *infra*, and more fully set forth in the attached claim chart (Ex. 8), the instrumentalities accused of infringing the '424 Patent include at least Defendant's vehicles featuring Google Built-In / Android Automotive OS. Defendant did not introduce vehicles with Google Built-In / Android Automotive OS until 2019. *See, e.g.*, Ex. 18, https://investor.gm.com/news-releases/news-release-details/general-motors-teams-google-cloud-ai-initiatives.

30. The fact that exemplary accused functionalities were not included in products introduced by Garmin and TomTom until after 2008-2009, and integrated into the Accused Instrumentalities until 2019, further demonstrates that the technology claimed in the '424 Patent was not well-understood, routine, and conventional as of November 2007.

31. Malikie is the assignee of and owns all rights, title, and interest to the ’424 Patent. KPI is the beneficiary of a trust of which Malikie is the trustee and holds, owns, and asserts the ’424 Patent for the benefit of KPI.

32. Plaintiffs have standing to sue for infringement of the ’424 Patent.

**The ’077 Patent**

33. The ’077 Patent, entitled “System and method for displaying address information on a map,” duly and legally issued on August 16, 2016, from U.S. Patent Application No. 14/746,220, filed on June 22, 2015, naming Ronald Dicke as the inventor. A copy of the ’077 Patent is attached hereto as Exhibit 2.

34. The ’077 Patent claims priority to U.S. Patent Application No. 14/220,217, which was filed on March 20, 2014 and issued as U.S. Patent No. 9,074,900. The ’077 patent also claims priority to U.S. Patent Application No. 13/912,257, which was filed on June 7, 2013 and issued as U.S. Patent No. 8,682,579. The ’077 Patent also claims priority to U.S. Patent Application No. 11/936,455, which was filed on November 7, 2007 and issued as the ’424 Patent.

35. The ’077 Patent claims are not directed to an abstract idea, contain inventive concepts, and are directed to patent-eligible subject matter and are therefore patent eligible under 35 U.S.C. § 101.

36. The ’077 Patent claims are directed to more than merely displaying address information. The ’077 Patent disclosure makes clear that the disclosed and

claimed inventions represent specific, technical solutions and advantages to shortcomings in the prior art.

37. As explained in the ’077 Patent, “[a]lthough street names and points of interest help a user navigate, it would be highly desirable to provide more detail about the device’s current position to further facilitate navigation.” Ex. 2, ’077 Patent, 1:48-51.

38. The ’077 Patent goes on to state that “[t]he present technology addresses a technical problem recognized by the applicant regarding the inadequacy of current navigation technologies. In particular, the applicant has observed that the graphical current position indicator on a map sometimes conveys an inadequate sense of position to the user, particularly in situations where the user wishes to know the street address corresponding to his or her current position . . . . [I]t is often difficult for the user to know with precision where he or she is located along a given street, boulevard or highway . . . . A further, yet related, problem recognized by the applicant is that it is often difficult for the user to see street numbers on passing dwellings and buildings, a problem that is particularly acute at night when street numbers on dwellings and buildings along the roadways are obscured by darkness. Even in daylight, street numbers can be difficult to read from heavy or fast-moving traffic, particularly where buildings or dwellings are set back far from the roadway. This problem is also solved by presenting address information, for example, in the

form of street numbers beside the graphical current position indicator on the map." *Id*. at 2:56-3:37.

39. The '077 Patent's disclosure and claims address this problem via a specific, system and multi-step process that, based on tracking the position of a mobile device, (1) determines position information of a position on a map, (2) displays a graphical position indicator representing the position on the map, (3) determines address information corresponding to the position on the map by obtaining from a server, address data containing the address information, and (4) presents the address information via a user interface of the mobile device by displaying a street number on the map adjacent to the graphical position indicator. *Id*. at claims 1, 12, 13.

40. The '077 Patent claims include inventive concepts and provide improvements over existing methods for determining and presenting information on navigational displays.

41. The subject matter claimed by the '077 Patent claims was not well-understood, routine, and conventional to those of skill in the art as of the '077 Patent's priority date—i.e., November 7, 2007.

42. To the extent any of the functionality claimed in the '077 Patent claims was known before November 2007, merely being "known" does not render something "well-understood, routine, and conventional" to a person of ordinary skill

in the art. Further, the claimed combination of features and functionalities was not well-understood, routine, and conventional before the November 2007 period.

43. Articles published after the '077 Patent's priority date, i.e., at least as early as November 2007, demonstrate that the '077 Patent claims are not directed to technology that was well-understood, routine, and conventional to one of ordinary skill in the art in the November 2007 time period. For example, in 2008, Garmin products did not have the capability to present on a map in real-time, address information corresponding to a user's current position as the user navigated a route. *See, e.g.*, Ex. 16, https://www.garmin.com/en-US/newsroom/press-release/automotive/2008-garminr-introduces-nuvir-7x5-series-with-lane-assist-giving-drivers-a-clear-picture-of-the-road-ahead (Garmin introduces new products with its new "Where Am I?" feature that "enable[d] drivers to look up their exact location including nearest address and intersection"); Ex. 2, '077 Patent, 3:18-26 ("The only prior art GPS navigation unit known to the applicant that provides anything related to street addresses is the Garmin™ StreetPilot c330 Automotive GPS which displays static street numbers, for example at an intersection of a boulevard. However, these static numbers do not identify the street address corresponding to the current position. Therefore, the Garmin™ technology would not assist a user who wishes to know the street address corresponding to his present location."). Similarly, in 2009, TomTom introduced its own "Where am I?" feature

that provided users with their "current location, longitude and latitude, and nearest intersections." Ex. 17, https://www.cnet.com/reviews/tomtom-one-125-review.

44. As discussed *infra*, and more fully set forth in the attached claim charts (Exs. 9 and 10), the instrumentalities accused of infringing the '077 Patent include at least Defendant's apps and vehicles featuring Google Built-In / Android Automotive OS. Defendant did not launch its mobile app until 2011 model year vehicles and did not introduce vehicles with Google Built-In / Android Automotive OS until 2019. *See, e.g.*, Ex. 19, https://www.autonews.com/article/20101029/OEM/101029812/gm-and-onstar-launch-mobile-apps-to-access-vehicle-information/; Ex. 18, https://investor.gm.com/news-releases/news-release-details/general-motors-teams-google-cloud-ai-initiatives.

45. The fact that exemplary accused functionalities were not included in products introduced by Garmin and TomTom until after 2008-2009, and integrated into the Accused Instrumentalities until 2011 and 2019, further demonstrates that the technology claimed in the '077 Patent was not well-understood, routine, and conventional as of November 2007.

46. On June 25, 2014, the USPTO issued its "Preliminary Examination Instructions in view of the Supreme Court Decision in *Alice Corporation Pty. Ltd. v. CLS Bank International, et al.*" *See*

https://www.uspto.gov/patents/laws/examination-policy/subject-matter-eligibility-examination-guidance-date (hereinafter, "USPTO's *Alice* Examination Guidelines"). The '077 Patent (as well as the '212 Patent discussed *infra*) was examined after the United States Supreme Court's decision in *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014) (hereinafter, "*Alice*"), and examined and issued under the USPTO's *Alice* Examination Guidelines. All of the asserted claims in each of these patents were found to be directed to patent eligible subject matter.

47. Malikie is the assignee of and owns all rights, title, and interest to the'077 Patent. KPI is the beneficiary of a trust of which Malikie is the trustee and holds, owns, and asserts the '077 Patent for the benefit of KPI.

48. Plaintiffs have standing to sue for infringement of the '077 Patent.

**The '936 Patent**

49. The '936 Patent, entitled "System and method for navigating between user interface elements across paired devices," duly and legally issued on August 6, 2013, from U.S. Patent Application No. 13/619,670, filed on September 14, 2012, naming Chris Kermoian and Joseph Goguen as the inventors. A copy of the '936 Patent is attached hereto as Exhibit 3.

50. The '936 Patent claims priority to U.S. Patent Application No. 13/397,533, which was filed on February 15, 2012 and issued as U.S. Patent No. 8,634,807. The '936 Patent also claims priority to U.S. Provisional Application Nos.

61/548,145, filed on October 17, 2011; 61/555,836, filed on November 4, 2011; and 61/555,984, filed on November 4, 2011.

51. The ’936 Patent claims are not directed to an abstract idea, contain inventive concepts, and are directed to patent-eligible subject matter and are therefore patent eligible under 35 U.S.C. § 101.

52. The ’936 Patent claims are directed to more than merely receiving data from one device and displaying it on another device. The ’936 Patent disclosure makes clear that the disclosed and claimed inventions represent specific, technical solutions and advantages to shortcomings in the prior art.

53. As explained in the ’936 Patent, “[c]omputing devices or systems providing user interfaces (UIs) on a display to enable users to interact with the computing devices or systems traditionally separate functionality and operability into distinct applications. For example, messages may be accessed through a messages inbox or application UI, calendar events may be accessed through a calendar application UI, instant messaging (IM) conversations may be accessed through an IM application, social networking updates may be accessed through the messages inbox UI or a social networking application UI, etc. The separation of data items associated with the functionally and operability of the computing device or system into different applications creates a virtual barrier between the data items. For example, if a user wishes to view a calendar appointment associated with a

message they are currently viewing, the user would typically navigate from the messages application UI to the calendar application UI and find the particular calendar appointment. On computing devices having relatively smaller displays, such as smart phones, tablet computers, portable gaming systems, and the like, having to navigate between applications in this way can be cumbersome and time consuming. Moreover, the user may inadvertently forget where they are navigating to and have difficulty returning to the previous application UI." Exhibit 3, '936 Patent, 1:20-43.

54. The '936 Patent goes on to explain that "[t]o provide a more convenient navigation flow between user interface items, an amalgamated 'dossier' view may be provided. Such a dossier view incorporates multiple links to item UIs, application UIs, and other dossier views to enable pivoting between related UIs and navigation through and around a connected social or business network without having to individually access each application UI and search or otherwise locate the desired item UIs, application UIs, or other dossier views." *Id*. at 3:42-50.

55. The '936 Patent claims are directed to an improved user interface, or UI, and recite a specific manner of displaying information, e.g., a multi-link / multi-application amalgamated UI, which allows users to intuitively navigate between UIs. *Id*.

56. Further, the ’936 Patent claims are not directed to merely summarizing information but instead disclose a particular, specific manner of presenting and displaying information via an improved user interface.

57. In addition, the dependent claims in the ’936 patent provide additional, specific technological requirements and improvements. *See, e.g.*, *id.* at Claims 2-6, 8-13. The additional limitations of these dependent claims go well beyond the alleged abstract idea of “receiving data from one device and displaying it on another device.” *Id.*

58. In addition, the ’936 Patent claims are directed to a specific device topology involving two electronic devices that communicate over a short-range connection.

59. The ’936 Patent claims include inventive concepts and provide improvements over existing user interfaces.

60. The subject matter claimed by the ’936 Patent claims was not well-understood, routine, and conventional to those of skill in the art as of the ’936 Patent’s priority date—i.e., the November 2011-February 2012 period.

61. To the extent any of the functionality claimed in the ’936 Patent claims was known before November 2011, merely being “known” does not render something “well-understood, routine, and conventional” to a person of ordinary skill in the art. Further, the claimed combination of features and functionalities was not

well-understood, routine, and conventional before the November 2011-February 2012 period.

62. For example, the book Distributed User Interfaces, Designing Interfaces for the Distributed Ecosystem, which was published on December 13, 2011—i.e., after the earliest priority date for the ’936 Patent—states that “[r]ecent advances in the field of display technology and mobile devices have had an important effect in the way users interact with all kinds of devices (computers, mobile devices, laptop, electronic devices, and so on). These new possibilities of interaction include the distribution of the User Interface (UI) among different devices.” Ex. 20, JOSÉ A. GALLUD, RICARDO TESORIERO & VICTOR M.R. PENICHET, DISTRIBUTED USER INTERFACES IX (2011). The book goes on to note that in “the last few years, the traditional concept of user interface has been changing significantly” and “[t]raditional user interfaces are evolving toward ‘distributed’ user interfaces according to the new technological advances, allowing one or more interaction elements distributed among many different platforms in order to support interaction with one or more users.” *Id.* at 13. The book goes on to describe this technological field as a “new area.” *Id.* at 2.

63. In addition, several research articles were published after the ’936 Patent’s priority date—i.e., at least as early as November 2011-February 2012—relating to the subject matter of the ’936 Patent, further demonstrating that the ’936

Patent claims are not directed to technology that was well-understood, routine, and conventional to one of ordinary skill in the art in the November 2011-February 2012 period. *See, e.g.*, Ex. 21, Peter Hamilton & Daniel Wigdor, *Conductor: Enabling and Understanding Cross-Device Interaction*, CHI 2014, ONE OF A CHIND (2014), *available at* https://dl.acm.org/doi/pdf/10.1145/2556288.2557170; Ex. 22, Steven Houben, et al., *Opportunities and Challenges for Cross-Device Interactions in the Wild*, INTERACTIONS (Sept.-Oct. 2017), *available at* https://dl.acm.org/doi/pdf/10.1145/3121348.

64. In addition, the aforementioned articles were peer-reviewed, meaning they underwent review, prior to publication, by experts in the field who confirmed that the subject matter of the article was directed to new, emerging technology, not something well-understood, routine, and conventional, which further demonstrates that the subject matter of the '936 Patent claims was not well-understood, routine, and conventional as of November 2011-February 2012.

65. As discussed *infra*, and more fully set forth in the attached claim chart (Ex. 11), the instrumentalities accused of infringing the '936 Patent include at least Defendant's vehicles having infotainment systems compatible with Android Auto.

66. Android Auto was not announced until June 25, 2014, and it was not publicly released until March 19, 2015, years after the '936 Patent's priority date. *See, e.g.*, Ex. 23, https://www.pcmag.com/news/google-launches-android-auto.

Further, Defendant did not introduce vehicles with Android Auto compatible infotainment units until the 2016 model year. *See, e.g.*, Ex. 24, https://www.wardsauto.com/news/archive-wards-gm-plans-apple-carplay-android-auto-deployment/786879/. Similarly, Apple CarPlay was not released until March 2014. *See, e.g.*, Ex. 25, https://cartechstudio.com/blogs/apple-carplay/first-car-with-apple-carplay.

67. The fact that exemplary accused functionalities were not released by Google until March 2015, and integrated into the Accused Instrumentalities until 2016, further demonstrates that the technology claimed in the ’936 Patent was not well-understood, routine, and conventional as of November 2011-February 2012.

68. In addition, Google, the developer of Android Auto, has cited the teachings of the ’936 Patent at least four times in its own patent filings. *See* Ex. 26, U.S. Patent No. 11,032,354, Ex. 27, U.S. Patent No. 11,425,193, Ex. 28, U.S. Patent No. 11,683,366, and Ex. 29, U.S. Patent No. 12,587,581. Notably, it was Google, not the USPTO, that identified and cited the ’936 Patent as relevant art to the examination of Google’s technology. *Id.* (noting that references found by the Examiner are denoted with an “*”).

69. Malikie is the assignee of and owns all rights, title, and interest to the ’936 Patent. KPI is the beneficiary of a trust of which Malikie is the trustee and holds, owns, and asserts the ’936 Patent for the benefit of KPI.

70. Plaintiffs have standing to sue for infringement of the ’936 Patent.

**The ’451 Patent**

71. The ’451 Patent, entitled “System and method for providing traffic notifications to mobile devices,” duly and legally issued on July 15, 2014, from U.S. Patent Application No. 13/720,312, filed on December 19, 2012, naming Christopher Wormald, Arcangelo Loberto, and Raymond Reddy as the inventors. A copy of the ’451 Patent is attached hereto as Exhibit 4.

72. The ’451 Patent is a continuation of U.S. Patent No. 8,351,912, which issued on January 8, 2013 from U.S. Patent Application No. 12/333,495, filed on December 12, 2008.

73. The ’451 Patent claims are not directed to an abstract idea, contain inventive concepts, and are directed to patent-eligible subject matter and are therefore patent eligible under 35 U.S.C. § 101.

74. The ’451 Patent claims are directed to more than merely providing traffic congestion notifications. The ’451 Patent disclosure makes clear that the disclosed and claimed inventions represent specific, technical solutions and advantages to shortcomings in the prior art.

75. As explained in the ’451 Patent, “[r]ush hour traffic volume, road construction, vehicular collisions, and roadside emergencies are just a few examples of the various events and circumstances that can cause traffic congestion. Due to the

nature of such events traffic congestion can be difficult to predict. Although radio, television, and online news sources can provide traffic information gathered using various techniques such as highway cameras, phone-in traffic tips, satellite imagery, and road sensors; this information is not always current or entirely accurate." Ex. 4, '451 Patent, 1:18-26.

76. The '451 Patent goes on to state that "[o]ld or inaccurate traffic information can be troublesome for various reasons. For example, an alternate traffic route, which may be less convenient, is chosen due to a traffic report indicating that a traffic problem exists, which problem has since been alleviated. This can cause a commuter to take a less optimal route, which can waste fuel, cause them to be late, and cause congestion on side-roads. Conversely, a traffic report may indicate that the commuter's route is clear, when in fact an event has, in the meantime, created a traffic jam, since the traffic report is based on information that is not current." *Id*. at 1:27-36.

77. The '451 Patent's disclosure and claims address this problem via a specific, system and multi-step process that, based on the tracking of a mobile device, (1) determines that a mobile device is approaching a traffic congestion zone, (2) sends a notification of the traffic congestion to the mobile device approaching the zone, (3) tracks over time the location of the mobile device, and (4) updates the

mobile device regarding the progress of traffic congestion by sending at least one follow up notification. *Id.* at claims 1, 9, 20-23.

78. The '451 Patent claims are directed to specific, particularized processes for real-time information and notification related to traffic congestion by using a mobile device's location over time. *Id.* at claims 1, 9, 20-23.

79. Further, the '451 Patent claims are not directed to merely providing traffic congestion notifications but instead disclose a particular, specific manner of not only receiving such notifications and providing an alert based on them but also providing the mobile device's location over time and receiving updates over time related to the progress of the traffic congestion.

80. The '451 Patent claims include inventive concepts and provide improvements over existing methods for obtaining and providing information about traffic congestion.

81. The subject matter claimed by the '451 Patent claims was not well-understood, routine, and conventional to those of skill in the art as of the '451 Patent's priority date—i.e., December 12, 2008.

82. To the extent any of the functionality claimed in the '451 Patent claims was known before December 2008, merely being "known" does not render something "well-understood, routine, and conventional" to a person of ordinary skill

in the art. Further, the claimed combination of features and functionalities was not well-understood, routine, and conventional before the December 2008 period.

83. For example, articles published after the ’451 Patent’s priority date, i.e., at least as early as December 2008, demonstrate that the ’451 Patent claims are not directed to technology that was well-understood, routine, and conventional to one of ordinary skill in the art in the December 2008 time period. *See, e.g.*, Ex. 30, https://www.wired.com/2009/08/google-mobile-maps-to-crowd-source-traffic-data (“Google has added US-wide real-time traffic data to its Google Maps for mobile service”); Ex. 31, Juan C. Herrera, et al., Evaluation of Traffic Data Obtained via GPS-Enabled Mobile Phones: the Mobile Century Field Experiment, (Aug. 2009) (on file with the UC Berkeley Center for Future Urban Transportation) (“The growing need of the driving public for accurate traffic information has spurred the deployment of large scale dedicated [GPS] monitoring infrastructure systems . . . This article presents a field experiment . . . conceived as a proof of concept of such a system.”) *available at* https://escholarship.org/uc/item/0sd42014.

84. The ’451 Patent claims were never rejected by the USPTO based on prior art. In other words, the USPTO never identified any prior art that either anticipated or rendered obvious the ’451 Patent claims. To the extent the subject matter of the ’451 Patent claims was directed to well-understood, routine, and conventional technology, the USPTO would have issued at least one rejection of at

least one of the ’451 Patent claims based on prior art. It did not. Instead, the USPTO confirmed that, based on its review of the prior art, no art, or combination of art, disclosed all the limitations of any of the ’451 Patent claims, thereby further demonstrating that the subject matter of those claims was not well-understood, routine, and conventional technology.

85. Malikie is the assignee of and owns all rights, title, and interest to the ’451 Patent. KPI is the beneficiary of a trust of which Malikie is the trustee and holds, owns, and asserts the ’451 Patent for the benefit of KPI.

86. Plaintiffs have standing to sue for infringement of the ’451 Patent.

**<u>The ’212 Patent</u>**

87. The ’212 Patent, entitled “Structured Low-Density Parity-Check (LDPC) Code,” duly and legally issued on September 15, 2020, from U.S. Patent Application No. 15/838,188, filed on December 11, 2017, naming Michael Livshitz, Aleksandar Purkovic, Nina Burns, Sergey Sukhobok, and Muhammad Chaudhry as the inventors. A copy of the ’212 Patent is attached hereto as Exhibit 5.

88. The ’212 Patent is a reissue of U.S. Patent No. 8,301,975, which issued on October 30, 2012 from U.S. Patent Application No. 13/156,942, filed on June 9, 2011. The ’212 Patent claims priority to U.S. Patent Application No. 14/527,483, which was filed on October 29, 2014 and issued as U.S. Patent No. RE46,692, which was a reissue of U.S. Patent No. 8,301,975. The ’212 Patent also claims priority to

U.S. Patent Application No. 11/665,171, which was filed on July 29, 2008 and issued as U.S. Pat. No. 7,996,746, which is a National Stage Entry of PCT Application No. PCT/CA2005/001563, which was filed on October 12, 2005. The ’212 Patent also claims priority to U.S. Provisional Application Nos. 60/673,323, filed on April 20, 2005; 60/656,587, filed on February 25, 2005; 60/647,259, filed on January 26, 2005; 60/639,420, filed on December 27, 2004; 60/638,832, filed on December 22, 2004; 60/635,525, filed on December 13, 2004; 60/627,348, filed on November 12, 2004; and 60/617,902, filed on October 12, 2004.

89. The ’212 Patent claims are not directed to an abstract idea, contain inventive concepts, and are directed to patent-eligible subject matter and are therefore patent eligible under 35 U.S.C. § 101.

90. The ’212 Patent claims are directed to more than merely applying a mathematical operation to encode data and thereafter further processing the encoded data. The ’212 Patent disclosure makes clear that the disclosed and claimed inventions represent specific, technical solutions and advantages to shortcomings in the prior art.

91. As explained in the ’212 Patent, “[i]n a typical communication system, forward error correction (FEC) is often applied in order to improve robustness of the system against a wide range of impairments of the communication channel . . . . In many modern communication systems, FEC uses Low-Density Parity-Check

(LDPC) codes that are applied to a block of information data of the finite length." Ex. 5, '212 Patent, 1:40-43, 58-60.

92. The '212 Patent goes on to explain that "[o]ne problem often faced by the designer of LDPC codes is that the base parity check matrices are designed to follow some assumed degree distribution, which is defined as the distribution of column weights of the parity check matrix. Column weight in turn equals the number of [sic] in a column. It has been shown that irregular degree distributions offer the best performance on the additive white Gaussian noise channel. However, the base parity check matrix does not exhibit any structure in its Hd portion to indicate the final matrix after expansion. The number of sub-matrix blocks, corresponding to the number of sub-iterations in the layered decoding algorithm may become large. Since the maximum number of rows that can be processed in parallel equals the number of rows in the sub-matrix block, the overall throughput may be impacted." *Id.* at 2:20-34.

93. The '212 Patent identifies other problems, including "select[ing] the largest suitable codeword from the available set of codewords and then properly adjust[ing] the amount of shortening and puncturing," "decoding time," and "degradation when common iterative decoding algorithms are used." *Id.* at 2:35-59.

94. The '212 Patent goes on to state that "there is an unmet need for a method, a system to design structured base parity check matrices, in combination

with expansion, allow achieving high throughput, low latency, and at the same time, the preservation of the simple encoding feature of the expanded codeword" and that "[t]here is further an unmet need for a method and a system to enable flexible rate adjustments by using shortening, or puncturing, or a combination of shortening and puncturing; and at the same time the code rate is approximately the same as the original one, and the coding gain is preserved." *Id.* at 2:60-3:2.

95. The '212 Patent claims are directed to specific methods and processes that address the identified shortcomings in the prior art. *Id.* at claims 13, 20, 28.

96. Further, the '212 Patent claims are not directed to merely applying a mathematical operation to encode data and thereafter further processing the encoded data but instead disclose a particular, specific manner of encoding data using low-density parity-check (LDPC) encoding via an improved encoding process. *Id.*

97. In addition, the dependent claims in the '212 Patent provide additional, specific technological requirements and improvements. *See, e.g.*, *id.* at Claims 14-19, 21-27, 29-33. The additional limitations of these dependent claims go well beyond the alleged abstract idea of "applying a mathematical operation to encode data and thereafter further processing the encoded data." *Id.*

98. The '212 Patent claims include inventive concepts and provide improvements over existing encoding processes, including existing LDPC encoding processes.

99. The subject matter claimed by the ’212 Patent claims was not well-understood, routine, and conventional to those of skill in the art as of the ’212 Patent’s priority date—i.e., the October 2004-April 2005 period.

100. To the extent any of the functionality claimed in the 212 Patent claims was known before the October 2004-April 2005 period, merely being “known” does not render something “well-understood, routine, and conventional” to a person of ordinary skill in the art. Further, the claimed combination of features and functionalities was not well-understood, routine, and conventional before the October 2004-April 2005 period.

101. The ’212 Patent (as well as the ’829 and ’289 Patents discussed *infra*) are standard essential patents, or SEPs, that disclose standard essential inventions that relate to wireless communications standards including Wi-Fi 4, Wi-Fi 5, Wi-Fi 6, and Wi-Fi 7 (IEEE 802.11n, 802.11ac, 802.11ax, and 802.11be), which are widely used in connected vehicles such as the Accused Instrumentalities.

102. The named inventors—Michael Livshitz, Aleksandar Purkovic, Nina Burns, Sergey Sukhobok, and Muhammad Chaudhry—were engineers working on advanced coding for wireless systems. Several of them authored technical submissions to the IEEE 802.11 Task Group n (“TGn”), the committee then writing the next-generation Wi-Fi standard (*see, e.g.*, Ex. 32, *Structured LDPC Codes as an Advanced Coding Scheme for 802.11n*, IEEE 802.11 Working Group (Sept. 2004),

*available at* https://mentor.ieee.org/802.11/documents?is_dcn=STR&is_year=2004; Ex. 33, *Structured LDPC Codes as an Advanced Coding Scheme for 802.11n*, IEEE 802.11 Working Group (Sept. 2004), *available at* https://mentor.ieee.org/802.11/documents?is_dcn=STR&is_year=2004), and the IEEE 802.16 TGn for the next generation WiMAX standard (one of the earliest technologies marketed as 4G), proposing structured LDPC codes as an advanced coding scheme for those standards (*see, e.g.*, Ex. 34, *LDPC coding for OFDMA PHY*, IEEE 802.16 Broadband Wireless Access Working Group (Jan. 10, 2005), *available at* https://grouper.ieee.org/groups/802/16/tge/contrib/C80216e-05_006.pdf; Ex. 35, *LDPC coding for OFDMA PHY*, IEEE 802.16 Broadband Wireless Access Working Group (rev. Jan. 25, 2005), *available at* https://www.ieee802.org/16/tge/contrib/C80216e-05_006r2.pdf).

103. On information and belief, the IEEE 802.11 TGn received submissions about the inventions disclosed in the ’212 Patent claims, studied, researched, and learned about the solutions disclosed in the ’212 Patent, and debated whether the next generation Wi-Fi standard should use the improved and novel LDPC encoding procedures disclosed in the ’212 Patent. The fact that the TGn, which is comprised of industry leaders and experts, studied, reviewed, analyzed, and debated the inventions disclosed in the ’212 Patent, and included them in the next-generation

Wi-Fi standard, highlights that the inventions claimed in the '212 Patent were not well-understood, routine, and conventional in the October 2004-April 2005 period.

104. As discussed *infra,* and more fully set forth in the attached claim chart (Ex. 13), the instrumentalities accused of infringing the '212 Patent include at least Defendant's vehicles having Wi-Fi communications functionality that is compliant with Wi-Fi 4, 5, 6, and/or 7 (IEEE Std. 802.11n, ac, ax, and/or be).

105. Defendant did not introduce vehicles with Wi-Fi functionality until the 2015 model year. Ex. 36, https://www.cbsnews.com/news/gm-is-making-your-car-a-rolling-wi-fi-hotspot/. The fact that Accused Instrumentalities with the accused functionalities were not released until, at the earliest, 2015, further demonstrates that the technology claimed in the '212 Patent was not well-understood, routine, and conventional as of the October 2004-April 2005 period.

106. The '212 Patent claims were examined post-*Alice* and under the USPTO's *Alice* Examination Guidelines. None of the '212 Patent claims were rejected under the USPTO's *Alice* Examination Guidelines. Rather, all were found by the USPTO to be directed to patent eligible subject matter.

107. Further, the '212 Patent is a reissue application of U.S. Patent No. 8,301,975 ("the '975 Patent"). The USPTO never rejected the '975 Patent claims, which are similar to the reissued '212 Patent claims, based on prior art. In other words, the USPTO never identified any prior art that either anticipated or rendered

obvious the ’975 Patent claims. To the extent the subject matter of the ’975 Patent claims was directed to well-understood, routine, and conventional technology, the USPTO would have issued at least one rejection of at least one of the ’975 Patent claims based on prior art. It did not, further supporting the finding that the subject matter of the ’212 Patent claims was not well understood, routine, and conventional as of the October 2004-April 2005 period. Further, while the USPTO did initially reject the ’212 Patent claims during prosecution based on prior art, the USPTO later withdrew that rejection, explicitly finding that the prior art did not disclose all of the claimed limitations.

108. Malikie is the assignee of and owns all rights, title, and interest to the ’212 Patent. KPI is the beneficiary of a trust of which Malikie is the trustee and holds, owns, and asserts the ’212 Patent for the benefit of KPI.

109. Plaintiffs have standing to sue for infringement of the ’212 Patent.

**The ’829 Patent**

110. The ’829 Patent, entitled “Low Density Parity Check (LDPC) Code,” duly and legally issued on March 29, 2011, from U.S. Patent Application No. 12/796,453, filed on June 8, 2010, naming Michael Livshitz as the inventor. A copy of the ’829 Patent is attached hereto as Exhibit 6.

111. The ’829 Patent claims priority to U.S. Patent Application No. 11/393,622, which was filed on March 30, 2006 and issued as U.S. Patent No.

7,752,521. The ’829 Patent also claims priority to PCT Application No. PCT/CA2005/001563, filed on October 12, 2005. The ’829 Patent also claims priority to U.S. Provisional Application Nos. 60/635,525, filed on December 13, 2004; 60/617,902, filed on October 12, 2004; 60/627,348, filed on November 12, 2004; 60/638,832, filed on December 22, 2004; 60/639,420, filed on December 27, 2004; 60/647,259, filed on January 26, 2005; 60/656,587, filed on February 25, 2005; 60/673,323, filed on April 20, 2005; and 60/727,932, filed on October 18, 2005.

112. The ’829 Patent claims are not directed to an abstract idea, contain inventive concepts, and are directed to patent-eligible subject matter and are therefore patent eligible under 35 U.S.C. § 101.

113. The ’829 Patent claims are directed to more than merely applying a mathematical operation to encode data and thereafter further processing the encoded data. The ’829 Patent disclosure makes clear that the disclosed and claimed inventions represent specific, technical solutions and advantages to shortcomings in the prior art.

114. As explained in the ’829 Patent, “[i]n a typical communication system, forward error correction (FEC) is often applied in order to improve robustness of the system against a wide range of impairments of the communication channel . . . . In many modern communication systems, FEC uses Low-Density Parity-Check

(LDPC) codes that are applied to a block of information data of the finite length." Ex. 6, '829 Patent, 1:26-29, 44-46.

115. The '829 Patent goes on to explain that "[o]ne problem often faced by the designer of LDPC codes is that the parity part of the base parity check matrix does not allow simple encoding algorithm. Another problem is that row weight is not uniform or not close to uniform. Therefore, there is an unmet need for LDPC codes for use in modern communication systems." *Id.* at 2:18-23.

116. The '829 Patent claims are directed to specific methods and processes that address the identified shortcomings in the prior art. *Id*. at Claim 1.

117. Further, the '829 Patent claims are not directed to merely applying a mathematical operation to encode data and thereafter further processing the encoded data but instead disclose a particular, specific manner of encoding data using low-density parity-check (LDPC) encoding via an improved encoding process. *Id*.

118. In addition, the dependent claims in the '829 Patent provide additional, specific technological requirements and improvements. *See, e.g.*, *id.* at Claims 2-10. The additional limitations of these dependent claims go well beyond the alleged abstract idea of "applying a mathematical operation to encode data and thereafter further processing the encoded data." *Id.*

119. The ’829 Patent claims include inventive concepts and provide improvements over existing encoding processes, including existing LDPC encoding processes.

120. The subject matter claimed by the ’829 Patent claims was not well-understood, routine, and conventional to those of skill in the art as of the ’829 Patent’s priority date—i.e., the December 2004-October 2005 period.

121. To the extent any of the functionality claimed in the ’829 Patent claims was known before the December 2004-October 2005 period, merely being “known” does not render something “well-understood, routine, and conventional” to a person of ordinary skill in the art. Further, the claimed combination of features and functionalities was not well-understood, routine, and conventional before the December 2004-October 2005 period.

122. The ’829 Patent (as well as the ’212 and ’289 Patents discussed *supra* and *infra*) are standard essential patents, or SEPs, that disclose standard essential inventions that relate to wireless communications standards including Wi-Fi 4, Wi-Fi 5, Wi-Fi 6, and Wi-Fi 7 (IEEE 802.11n, 802.11ac, 802.11ax, and 802.11be), which are widely used in connected vehicles such as the Accused Instrumentalities.

123. The named inventor—Michael Livshitz—was an engineer working on advanced coding for wireless systems. He authored technical submissions to the IEEE 802.16 TGn, the committee then writing the next-generation WiMAX standard

(one of the earliest technologies marketed as 4G), proposing structured LDPC codes as an advanced coding scheme for that standard. *See, e.g.*, Ex. 34, *LDPC coding for OFDMA PHY*, IEEE 802.16 Broadband Wireless Access Working Group (Jan. 10, 2005), *available at* https://grouper.ieee.org/groups/802/16/tge/contrib/C80216e-05_006.pdf; Ex. 35, *LDPC coding for OFDMA PHY*, IEEE 802.16 Broadband Wireless Access Working Group (rev. Jan. 25, 2005), *available at* https://www.ieee802.org/16/tge/contrib/C80216e-05_006r2.pdf.

124. On information and belief, the TGn received submissions about the inventions disclosed in the '829 Patent claims, studied, researched, and learned about the solutions disclosed in the '829 Patent, and debated whether the next generation standards should use the improved and novel LDPC encoding procedures disclosed in the '829 Patent. The fact that the TGn, which is comprised of industry leaders and experts, studied, reviewed, analyzed, and debated the inventions disclosed in the '829 Patent, and included them in the next-generation standards, highlights that the inventions claimed in the '829 Patent were not well-understood, routine, and conventional in the December 2004-October 2005 period.

125. In the December 2004-October 2005 period, no Wi-Fi standard used LDPC codes. The then-current Wi-Fi standards, such as IEEE 802.11a (released 1999) and 802.11g (released 2003), primarily used an older, prior encoding technology called binary convolutional coding, or BCC.

126. The first Wi-Fi standard to use LDPC codes was IEEE 802.11n (or Wi-Fi 4), which was released in 2009, years after the priority date of the '829 Patent. Further, the inventions claimed in the '829 Patent have remained a part of Wi-Fi standards, including in successive generations of standards, e.g., IEEE 802.11ac (Wi-Fi 5, released 2013), IEEE 802.11ax (Wi-Fi 6, released 2021), and IEEE 802.11be (Wi-Fi 7, released 2025). This further demonstrates that the inventions claimed in the '829 Patent were not well-understood, routine, and conventional as of the December 2004-October 2005 period.

127. As discussed *infra,* and more fully set forth in the attached claim chart (Ex. 14), the instrumentalities accused of infringing the '829 Patent include at least Defendant's vehicles having Wi-Fi communications functionality that is compliant with Wi-Fi 4, 5, 6, and/or 7 (IEEE Std. 802.11n, ac, ax, and/or be).

128. Defendant did not introduce vehicles with Wi-Fi functionality until the 2015 model year. Ex. 36, https://www.cbsnews.com/news/gm-is-making-your-car-a-rolling-wi-fi-hotspot/. The fact that Accused Instrumentalities with the accused functionalities were not released until, at the earliest, 2015, further demonstrates that the technology claimed in the '829 Patent was not well-understood, routine, and conventional as of the December 2004-October 2005 period.

129. The '829 Patent claims were never rejected by the USPTO based on prior art. In other words, the USPTO never identified any prior art that either

anticipated or rendered obvious the ’829 Patent claims. To the extent the subject matter of the ’829 Patent claims was directed to well-understood, routine, and conventional technology, the USPTO would have issued at least one rejection of at least one of the ’829 Patent claims based on prior art. It did not. Instead, the USPTO confirmed that, based on its review of the prior art, no art, or combination of art, disclosed all the limitations of any of the ’829 Patent claims, thereby further demonstrating that the subject matter of those claims was not well-understood, routine, and conventional technology.

130. Malikie is the assignee of and owns all rights, title, and interest to the ’829 Patent. KPI is the beneficiary of a trust of which Malikie is the trustee and holds, owns, and asserts the ’829 Patent for the benefit of KPI.

131. Plaintiffs have standing to sue for infringement of the ’829 Patent.

**The ’289 Patent**

132. The ’289 Patent, entitled “Low Density Parity Check (LDPC) Code,” duly and legally issued on October 16, 2012, from U.S. Patent Application No. 13/346,155, filed on January 9, 2012, naming Michael Livshitz as the inventor. A copy of the ’289 Patent is attached hereto as Exhibit 7.

133. The ’289 Patent claims priority to U.S. Patent Application No. 12/987,729, which was filed on January 10, 2011 and issued as U.S. Patent No. 8,099,646. The ’289 Patent also claims priority to U.S. Patent Application No.

12/796,453, which was filed on June 8, 2010 and issued as the ’829 Patent. The ’289 Patent also claims priority to U.S. Patent Application No. 11/393,622, which was filed on March 30, 2006 and issued as U.S. Patent No. 7,752,521. The ’289 Patent also claims priority to PCT Application No. PCT/CA2005/001563, filed on October 12, 2005. The ’289 Patent also claims priority to U.S. Provisional Application Nos. 60/617,902, filed on October 12, 2004; 60/627,348, filed on November 12, 2004; 60/635,525, filed on December 13, 2004; 60/638,832, filed on December 22, 2004; 60/639,420, filed on December 27, 2004; 60/647,259, filed on January 26, 2005; 60/656,587, filed on February 25, 2005; 60/673,323, filed on April 20, 2005; and 60/727,932, filed on October 18, 2005.

134. The ’289 Patent claims are not directed to an abstract idea, contain inventive concepts, and are directed to patent-eligible subject matter and are therefore patent eligible under 35 U.S.C. § 101.

135. The ’289 Patent claims are directed to more than merely applying a mathematical operation to encode data and thereafter further processing the encoded data. The ’289 Patent disclosure makes clear that the disclosed and claimed inventions represent specific, technical solutions and advantages to shortcomings in the prior art.

136. As explained in the ’289 Patent, “[i]n a typical communication system, forward error correction (FEC) is often applied in order to improve robustness of the

system against a wide range of impairments of the communication channel . . . . In many modern communication systems, FEC uses Low-Density Parity-Check (LDPC) codes that are applied to a block of information data of the finite length." Ex. 7, '289 Patent, 1:34-37, 52-54.

137. The '289 Patent goes on to explain that "[o]ne problem often faced by the designer of LDPC codes is that the parity part of the base parity check matrix does not allow simple encoding algorithm. Another problem is that row weight is not uniform or not close to uniform. Therefore, there is an unmet need for LDPC codes for use in modern communication systems." *Id.* at 2:21-26.

138. The '289 Patent claims are directed to specific methods and processes that address the identified shortcomings in the prior art. *Id*. at Claims 1-14.

139. Further, the '289 Patent claims are not directed to merely applying a mathematical operation to encode data and thereafter further processing the encoded data but instead disclose a particular, specific manner of encoding data using low-density parity-check (LDPC) encoding via an improved encoding process. *Id*.

140. The '289 Patent claims include inventive concepts and provide improvements over existing encoding processes, including existing LDPC encoding processes.

141. The subject matter claimed by the ’289 Patent claims was not well-understood, routine, and conventional to those of skill in the art as of the ’289 Patent’s priority date—i.e., the October 2004-October 2005 period.

142. To the extent any of the functionality claimed in the ’289 Patent claims was known before the October 2004-October 2005 period, merely being “known” does not render something “well-understood, routine, and conventional” to a person of ordinary skill in the art. Further, the claimed combination of features and functionalities was not well-understood, routine, and conventional before the October 2004-October 2005 period.

143. The ’289 Patent (as well as the ’212 and ’829 Patents discussed *supra*) are standard essential patents, or SEPs, that disclose standard essential inventions that relate to wireless communications standards including Wi-Fi 4, Wi-Fi 5, Wi-Fi 6, and Wi-Fi 7 (IEEE 802.11n, 802.11ac, 802.11ax, and 802.11be), which are widely used in connected vehicles such as the Accused Instrumentalities.

144. The named inventor—Michael Livshitz—was an engineer working on advanced coding for wireless systems. He authored technical submissions to the IEEE 802.16 TGn, the committee then writing the next-generation WiMAX standard (one of the earliest technologies marketed as 4G), proposing structured LDPC codes as an advanced coding scheme for that standard. *See, e.g.*, Ex. 34, *LDPC coding for OFDMA PHY,* IEEE 802.16 Broadband Wireless Access Working Group (Jan. 10,

2005), *available at* https://grouper.ieee.org/groups/802/16/tge/contrib/C80216e-05_006.pdf; Ex. 35, *LDPC coding for OFDMA PHY*, IEEE 802.16 Broadband Wireless Access Working Group (rev. Jan. 25, 2005), *available at* https://www.ieee802.org/16/tge/contrib/C80216e-05_006r2.pdf.

145. On information and belief, the TGn received submissions about the inventions disclosed in the '289 Patent claims, studied, researched, and learned about the solutions disclosed in the '289 Patent, and debated whether the next generation standards should use the improved and novel LDPC encoding procedures disclosed in the '289 Patent. The fact that the TGn, which is comprised of industry leaders and experts, studied, reviewed, analyzed, and debated the inventions disclosed in the '289 Patent, and included them in the next-generation standards, highlights that the inventions claimed in the '289 Patent were not well-understood, routine, and conventional in the October 2004-October 2005 period.

146. In the October 2004-October 2005 period, no Wi-Fi standard used LDPC codes. The then-current Wi-Fi standards, such as IEEE 802.11a (released 1999) and 802.11g (released 2003), primarily used an older, prior encoding technology called binary convolutional coding, or BCC.

147. The first Wi-Fi standard to use LDPC codes was IEEE 802.11n (or Wi-Fi 4), which was released in 2009, years after the priority date of the '289 Patent. Further, the inventions claimed in the '289 Patent have remained a part of Wi-Fi

standards, including in successive generations of standards, e.g., IEEE 802.11ac (Wi-Fi 5, released 2013), IEEE 802.11ax (Wi-Fi 6, released 2021), and IEEE 802.11be (Wi-Fi 7, released 2025). This further demonstrates that the inventions claimed in the ’289 Patent were not well-understood, routine, and conventional as of the October 2004-October 2005 period.

148. As discussed *infra,* and more fully set forth in the attached claim chart (Ex. 15), the instrumentalities accused of infringing the ’289 Patent include at least Defendant’s vehicles having Wi-Fi communications functionality that is compliant with Wi-Fi 4, 5, 6, and/or 7 (IEEE Std. 802.11n, ac, ax, and/or be).

149. Defendant did not introduce vehicles with Wi-Fi functionality until the 2015 model year. Ex. 36, https://www.cbsnews.com/news/gm-is-making-your-car-a-rolling-wi-fi-hotspot/. The fact that Accused Instrumentalities with the accused functionalities were not released until, at the earliest, 2015, further demonstrates that the technology claimed in the ’289 Patent was not well-understood, routine, and conventional as of the October 2004-October 2005 period.

150. The USPTO allowed the ’289 Patent claims without rejection, commonly referred to as a first action allowance. In the 2012 period, first-action allowances occurred only about 11% of the time. Ex. 37, Michael Carley, Deepak Hegde & Alan Marco, *What Is The Probability of Receiving a U.S. Patent?*, 17 YALE J.L. & TECH. 203 (2015), *available at*

https://yjolt.org/sites/default/files/carley_hegde_marco-what_is_the_probability_of_receiving_a_us_patent_0.pdf. To the extent the subject matter of the ’289 Patent claims was directed to well-understood, routine, and conventional technology, the USPTO would have issued at least one rejection of at least one of the ’289 Patent claims. It did not. Instead, the USPTO confirmed that, based on its review of the prior art, no art, or combination of art, disclosed all the limitations of any of the ’289 Patent claims, thereby further demonstrating that the subject matter of those claims was not well-understood, routine, and conventional technology.

151. Malikie is the assignee of and owns all rights, title, and interest to the ’289 Patent. KPI is the beneficiary of a trust of which Malikie is the trustee and holds, owns, and asserts the ’289 Patent for the benefit of KPI.

152. Plaintiffs have standing to sue for infringement of the ’289 Patent.

## GENERAL ALLEGATIONS

153. Defendant does not have, and has never had, Plaintiffs’ permission to make, use, sell, offer to sell, or import products or practice methods that are covered by one or more claims of any of the Patents-in-Suit.

154. Defendant has made, used, sold, offered to sell, and/or imported into the United States products that infringe (directly and/or indirectly) one or more claims in each of the Patents-in-Suit.

155. Defendant has infringed (literally and/or under the doctrine of equivalents), directly, indirectly, and/or through subsidiaries, agents, representatives, or intermediaries, one or more claims of each of the Patents-in-Suit by, for example, making, using, importing, testing, demonstrating, marketing, promoting, financing, leasing, repairing, offering and conducting test drives of, selling, and/or offering for sale in the United States the Accused Instrumentalities.

156. Further, Defendant's customers have directly infringed the Patents-in-Suit by using the Accused Instrumentalities.

157. Defendant is in the business of offering to sell and selling, including assisting with financing the sales of, the Accused Instrumentalities and encouraging and helping its dealers and/or customers to use the Accused Instrumentalities, including in an infringing manner. Through at least its product manuals, websites, sales and marketing activities, and/or financing practices, including its terms, contracts, and agreements, Defendant has and continues to (where applicable) solicit, instruct, encourage, and aid and abet its dealers and/or customers to purchase and use the Accused Instrumentalities in an infringing way. *See, e.g.*, https://www.gm.com/; https://www.gm.com/our-brands; https://www.gmfinancial.com/en-us/home.html; https://experience.gm.com/support/vehicle/manuals-guides.

158. Defendant has, and continues to, sell Accused Instrumentalities in the United States, including in this District to dealers and directly to customers. *See, e.g.*, Ex. 38, https://www.gmdealerdevelopment.com/ ("GM sells vehicles to everyone everywhere.").

159. In addition, Defendant, through Defendant's brand websites, e.g., https://www.chevrolet.com/, https://www.buick.com/, https://www.gmc.com/, https://www.cadillac.com/, each of which appears to be owned and operated by Defendant, Defendant provides offers to sell the Accused Instrumentalities, including detailed incentives, pricing, and an online "shop" tool.

160. In addition, Defendant, through the Defendant's brand websites, directs, encourages, and incentivizes, or in other words, induces, others, such as its customers, including prospective purchasers, to purchase the Accused Instrumentalities. *See, e.g.*, https://www.chevrolet.com/, https://www.buick.com/, https://www.gmc.com/, https://www.cadillac.com/.

161. Defendant also induces others to use the Accused Instrumentalities and directly infringe the Patents-in-Suit via its OnStar websites. *See, e.g.*, https://www.gm.com/onstar. Defendant also directs and encourages users to download and use its respective connected vehicle brand Apps, myChevrolet (myChevy), myBuick, myGMC, and myCadillac.

162. The connected services and Apps offered and used by Defendant provide an additional revenue stream for Defendant. For example, GM reported that it generated $2.7 billion in recognized connected-services revenue in 2025 alone. *See, e.g.*, Ex. 39, https://counterpointresearch.com/en/reports/connected-car-revenue-gap-strong-volumes-uneven-monetization.

163. Further, at its October 2021 Investor Day presentation, GM "projected a $20-25 billion annual opportunity in software and services by 2030, based on a projected 30 million connected vehicles in the United States. *Id*. Stellantis was even more ambitious, "targeting approximately $23 billion in incremental annual revenue from software-enabled vehicles, related services, and subscriptions by 2030 at its December 2021 Software Day, with an interim goal of roughly $4.5 billion by 2026." *Id*. GM estimated approximately $7.5 billion in deferred revenue from these connected services for 2026. *Id*.

164. Defendant has had, or should have had, knowledge of the Patents-in-Suit at least through Plaintiffs' sending of (and General Motors' receipt of) notice letters dated January 8, 2024, August 9, 2024, October 18, 2024, and November 8, 2024, as well as presentations on May 2, 2025, August 18, 2025, October 10, 2025, January 23, 2026, which identified the '424 Patent, the '077 Patent, the '936 Patent, the '451 Patent, the '212 Patent, the '829 Patent, the '289 Patent, and additional patents, and the Accused Instrumentalities as infringing the Patents-in-Suit. In

addition, or in the alternative, Defendant has had knowledge of the Patents-in-Suit through the service of this Complaint.

165. By receiving such notice of infringement, Defendant obtained a subjective belief that there is a high probability that the Accused Instrumentalities infringe the Patents-in-Suit. Despite being put on notice of infringement, on information and belief, Defendant has not taken any actions to avoid the conduct alleged to infringe and has not sought to remedy its infringements by offering to take a license. Defendant's failure to act reflects deliberate actions to avoid learning that the Accused Instrumentalities infringe the Patents-in-Suit and, more generally, a policy of not earnestly reviewing and respecting the intellectual property of others.

166. Defendant's actions after learning of the Patents-in-Suit were with specific intent to cause infringement of one or more claims of each of the Patents-in-Suit.

167. Further discovery may reveal earlier knowledge of one or more of the Patents-in-Suit, which would provide additional evidence of Defendant's specific intent, willful blindness, and/or willful infringement of the Patents-in-Suit.

168. Despite having knowledge of the Patents-in-Suit, as well as knowledge that it was directly and/or indirectly infringing one or more claims of each Patent-in-Suit, Defendant nevertheless proceeded to infringe the Patents-in-Suit, and induce others to do the same, with full and complete knowledge of the applicability of the

Patents-in-Suit to the Accused Instrumentalities, without a license and without a good faith belief that the claims of the Patents-in-Suit were not infringed. As noted above, this includes, but is not limited to, the willful blindness of Defendant including its refusal to investigate whether the Accused Instrumentalities infringe the Patents-in-Suit.

169. Plaintiffs have been damaged as a result of Defendant's infringing conduct. Defendant is therefore liable to Plaintiffs in an amount that adequately compensates Plaintiffs for Defendant's infringement, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

170. In addition, for the reasons discussed herein, Defendant's infringing activities detailed in this Complaint have been willful, egregious, wanton, and deliberate in disregard to Plaintiffs' rights, justifying a finding of willful infringement, enhanced damages under 35 U.S.C. § 284, and attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

171. Defendant failed to obtain permission from Plaintiffs to make, use, sell, offer to sell, or import products incorporating the inventions claimed in the Patents-in-Suit including, but not limited to, the Accused Instrumentalities.

172. Malikie sent General Motors a letter (addressed to GM North America VP & General Counsel, Mr. Chris Johnson), dated January 8, 2024, offering a license

to Malikie's patent portfolio, identifying several of Malikie's patents, and identifying exemplary products or services that Malikie believes infringe those patents.

173. Malikie sent General Motors a further letter (again addressed to Mr. Chris Johnson), dated August 9, 2024, offering a license to Malikie's patent portfolio, identifying several of Malikie's patents, and identifying exemplary products or services that Malikie believes infringe those patents.

174. Malikie sent General Motors a further letter (again addressed to Mr. Chris Johnson), dated October 18, 2024, offering a license to Malikie's patent portfolio, identifying several of Malikie's patents, and identifying exemplary products or services that Malikie believes infringe those patents.

175. Malikie sent General Motors further letters dated October 18, 2024 and November 8, 2024, made presentations to General Motors on May 2, 2025, August 18, 2025, October 10, 2025, January 23, 2026, and had meetings with General Motors in at least April 2025, May 2025, October 2025, and January 2026, as well as engaged in lengthy correspondence with General Motors between these various meetings, including a revised license offer in May 2026. Despite Malikie's repeated efforts to conduct good-faith licensing discussions with General Motors over at least the last year and a half, including the many notice letters, presentations, meetings, correspondence, and offers, Defendant has not negotiated in good faith and instead

continues to make use of Malikie's patented technology without authorization. The parties' licensing negotiations have been unsuccessful for the simple reason that Defendant refuses to respond in any substantive manner or pay FRAND royalties for Malikie's valuable SEP portfolios.

## IEEE 802.11 STANDARDS AND PLAINTIFFS' FRAND OBLIGATIONS

176. The Institute of Electrical and Electronics Engineers ("IEEE") is a professional association that, among other activities, develops and publishes technical standards across a wide range of fields, including telecommunications and wireless communications.

177. The IEEE-Standards Association ("IEEE-SA") is the standards development organization within the IEEE responsible for developing and maintaining consensus-based standards in various industries, including the IEEE 802.11 family of wireless networking standards (commonly known as "Wi-Fi"). The IEEE 802.11 standards define specifications for the medium access control ("MAC") and physical ("PHY") layers to enable interoperable wireless local area network implementations. The IEEE-SA requires participants in its standards development process to comply with its patent policy, which governs the disclosure and licensing of patent rights that may be essential to the implementation of an IEEE standard. Participants are required to disclose the existence of patents or pending patent applications that they believe may contain claims essential or potentially

essential to a proposed or approved standard. When such disclosure is made, the patent holder is requested to submit a Letter of Assurance ("LOA") stating whether it is willing to grant licenses to implementers of the relevant standard under terms that are fair, reasonable, and non-discriminatory ("FRAND"), consistent with the IEEE-SA patent policy.

178. BlackBerry participated actively in the IEEE standards development process, including the development of numerous standards within the 802.11 family. On multiple occasions, BlackBerry submitted public LOAs to the IEEE-SA stating that it may own patents containing Essential Patent Claims with respect to certain IEEE 802.11 standards, including the IEEE 802.11-2012, 802.11k, 802.11mb, 802.11n, 802.11p, 802.11r, 802.11s, 802.11u, 802.11v, 802.11w, 802.11y, 802.11z, 802.11aa, 802.11ad, and 802.11ae standards. In those LOAs, BlackBerry further indicated that it was willing to grant licenses under any patents containing Essential Patent Claims on terms that are FRAND.

179. The IEEE Patent Policy makes clear that FRAND negotiations require a reciprocal duty of the SEP holder (Submitter) and licensee (Applicant) to engage in good faith negotiations without unreasonable delay, or alternatively, litigate. Section 6.2 of the current IEEE SA Standards Board Bylaws states:

> The Submitter and the Applicant should engage in good faith negotiations (if sought by either party) without unreasonable delay or may litigate . . . over patent validity, enforceability, essentiality, or infringement; Reasonable Rates or other licensing terms and

> conditions; compensation for unpaid past royalties or a future royalty rate . . . .

180. As mentioned above, Malikie offered General Motors the chance to license its SEPs, including those covering IEEE 802.11 standards, on Fair, Reasonable, and Non-Discriminatory ("FRAND") terms. Malikie has notified General Motors of infringement of its SEPs since at least 2024. Particularly, Malikie notified General Motors of its infringement of the '829 Patent, the '289 Patent, and the '212 Patent on January 8, 2024. On or about August 9, 2024, Malikie offered a specific FRAND royalty rate for all patents essential to the IEEE 802.11 standards. Further, in May 2026, Malikie offered a lump-sum FRAND license proposal for all patents essential to the IEEE 802.11 standards. As detailed above, Malikie has shared evidence of Defendant's infringement of Malikie's SEPs and made repeated efforts to engage in licensing discussions with General Motors from January 8, 2024 through June 2026. More than eighteen months have passed since Malikie's first FRAND offer. Yet Defendant has not accepted Malikie's proposed rate or even counter-offered with a rate that they believe is FRAND.

181. Despite Malikie's numerous attempts to discuss licensing terms with Defendant, Defendant has not consented to a license. And despite having been offered a FRAND rate at which to license Malikie's SEPs, Defendant has effectively refused Malikie's rate and has never provided an alternate rate that it believes is FRAND.

182. By not complying with its FRAND obligations, Defendant has waived its rights to demand FRAND compliance from Malikie.

183. Malikie has therefore been left with no choice but to bring this action to enforce its rights as the owner of valid and valuable patents that Defendant is willfully infringing. In addition, Malikie commits to grant licenses on FRAND terms under any patents acquired from BlackBerry that contain Essential Patent Claims relating to any IEEE 802.11 standards, including those with respect to which BlackBerry did not submit an LOA.

184. For each count of infringement listed below, Plaintiffs incorporate and re-state the allegations contained in the preceding paragraphs above, including these General Allegations, as if fully set forth in each count of infringement.

**COUNT I – INFRINGEMENT OF THE ’424 PATENT**

185. Plaintiffs incorporate herein the allegations made in paragraphs 1 through 184.

186. Defendant has directly and/or indirectly infringed, and continues to infringe directly and/or indirectly, one or more claims of the ’424 Patent, including, for example, claim 1, in violation of 35 U.S.C. § 271(a) and/or (b) by making, using, selling, offering for sale, and/or importing into the United States the Accused Instrumentalities.

187. An exemplary claim chart demonstrating Defendant's infringement of the '424 Patent, as well as Defendant's customers' infringement of the '424 Patent, which has been induced by Defendant, is attached as Exhibit 8 and incorporated herein by reference.

188. Additionally, Defendant has indirectly infringed, and continues to indirectly infringe, the '424 Patent in violation of 35 U.S.C. § 271(b) at least by inducing dealerships and customers to purchase, demonstrate, test, and/or use the Accused Instrumentalities in a way that directly infringes at least claim 1 of the '424 Patent.

189. On information and belief, despite Defendant's knowledge of the '424 Patent and of its infringement of the '424 Patent, Defendant has not sought to remedy its infringement or sought to identify any good faith belief as to why it does not infringe the '424 Patent.

190. On information and belief, Defendant's actions represented a specific intent to induce infringement of at least claim 1 of the '424 Patent. For example, Defendant offered its dealers and/or customers extensive customer support, instructions, marketing and sales materials, test drives, service, financing, and support that instructed and encouraged its customers to obtain and use the Accused Instrumentalities in an infringing manner, including inducing actions that constitute direct infringement of claim 1 of the '424 Patent.

191. As a result of Defendant's infringement of the '424 Patent, Plaintiffs have suffered and are owed monetary damages adequate to compensate them for the infringement under 35 U.S.C. § 284, but in no event less than a reasonable royalty.

192. In addition, Defendant's infringing activities detailed in this Complaint have been willful, egregious, wanton, and deliberate in disregard to Plaintiffs' rights, justifying a finding of willful infringement, enhanced damages under 35 U.S.C. § 284, and attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT II – INFRINGEMENT OF THE '077 PATENT

193. Plaintiffs incorporate herein the allegations made in paragraphs 1 through 184.

194. Defendant has directly and/or indirectly infringed, and continues to directly and/or indirectly infringe, one or more claims of the '077 Patent, including, for example, claim 1, in violation of 35 U.S.C. § 271(a) and/or (b) by making, using, selling, offering for sale, and/or importing into the United States the Accused Instrumentalities.

195. Exemplary claim charts demonstrating Defendant's infringement of the '077 Patent, as well as Defendant's customers' infringement of the '077 Patent, which has been induced by Defendant, are attached as Exhibits 9 and 10 and incorporated herein by reference.

196. Additionally, Defendant has indirectly infringed, and continues to indirectly infringe, the ’077 Patent in violation of 35 U.S.C. § 271(b) at least by inducing dealerships and customers to purchase, demonstrate, test, and/or use the Accused Instrumentalities in a way that directly infringes at least claim 1 of the ’077 Patent.

197. On information and belief, despite Defendant’s knowledge of the ’077 Patent and of its infringement of the ’077 Patent, Defendant has not sought to remedy its infringement or sought to identify any good faith belief as to why it does not infringe the ’077 Patent.

198. On information and belief, Defendant’s actions represented a specific intent to induce infringement of at least claim 1 of the ’077 Patent. For example, Defendant offered its dealers and/or customers extensive customer support, instructions, marketing and sales materials, test drives, service, financing, and support that instructed and encouraged its customers to obtain and use the Accused Instrumentalities in an infringing manner, including inducing actions that constitute direct infringement of claim 1 of the ’077 Patent.

199. As a result of Defendant’s infringement of the ’077 Patent, Plaintiffs have suffered and are owed monetary damages adequate to compensate them for the infringement under 35 U.S.C. § 284, but in no event less than a reasonable royalty.

200. In addition, Defendant's infringing activities detailed in this Complaint have been willful, egregious, wanton, and deliberate in disregard to Plaintiffs' rights, justifying a finding of willful infringement, enhanced damages under 35 U.S.C. § 284, and attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT III – INFRINGEMENT OF THE '936 PATENT

201. Plaintiffs incorporate herein the allegations made in paragraphs 1 through 184.

202. Defendant has directly and/or indirectly infringed, and continues to infringe directly and/or indirectly, one or more claims of the '936 Patent, including, for example, claim 7, in violation of 35 U.S.C. § 271(a) and/or (b) by making, using, selling, offering for sale, and/or importing into the United States the Accused Instrumentalities.

203. An exemplary claim chart demonstrating Defendant's infringement of the '936 Patent, as well as Defendant's customers' infringement of the '936 Patent, which has been induced by Defendant, is attached as Exhibit 11 and incorporated herein by reference.

204. Additionally, Defendant has indirectly infringed, and continues to indirectly infringe, the '936 Patent in violation of 35 U.S.C. § 271(b) at least by inducing dealerships and customers to purchase, demonstrate, test, and/or use the

Accused Instrumentalities in a way that directly infringes at least claim 7 of the ’936 Patent.

205. On information and belief, despite Defendant’s knowledge of the ’936 Patent and of its infringement of the ’936 Patent, Defendant has not sought to remedy its infringement or sought to identify any good faith belief as to why it does not infringe the ’936 Patent.

206. On information and belief, Defendant’s actions represented a specific intent to induce infringement of at least claim 7 of the ’936 Patent. For example, Defendant offered its dealers and/or customers extensive customer support, instructions, marketing and sales materials, test drives, service, financing, and support that instructed and encouraged its customers to obtain and use the Accused Instrumentalities in an infringing manner, including inducing actions that constitute direct infringement of claim 7 of the ’936 Patent.

207. As a result of Defendant’s infringement of the ’936 Patent, Plaintiffs have suffered and are owed monetary damages adequate to compensate them for the infringement under 35 U.S.C. § 284, but in no event less than a reasonable royalty.

208. In addition, Defendant’s infringing activities detailed in this Complaint have been willful, egregious, wanton, and deliberate in disregard to Plaintiffs’ rights, justifying a finding of willful infringement, enhanced damages under 35 U.S.C. §

284, and attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT IV – INFRINGEMENT OF THE '451 PATENT

209. Plaintiffs incorporate herein the allegations made in paragraphs 1 through 184.

210. Defendant has directly and/or indirectly infringed, and continues to directly and/or indirectly infringe, one or more claims of the '451 Patent, including, for example, claim 9, in violation of 35 U.S.C. § 271(a) and/or (b) by making, using, selling, offering for sale, and/or importing into the United States the Accused Instrumentalities.

211. An exemplary claim chart demonstrating Defendant's infringement of the '451 Patent, as well as Defendant's customers' infringement of the '451 Patent, which has been induced by Defendant, is attached as Exhibit 12 and incorporated herein by reference.

212. Additionally, Defendant has indirectly infringed, and continues to indirectly infringe, the '451 Patent in violation of 35 U.S.C. § 271(b) at least by inducing dealerships and customers to purchase, demonstrate, test, and/or use the Accused Instrumentalities in a way that directly infringes at least claim 9 of the '451 Patent.

213. On information and belief, despite Defendant's knowledge of the '451 Patent and of its infringement of the '451 Patent, Defendant has not sought to remedy its infringement or sought to identify any good faith belief as to why it does not infringe the '451 Patent.

214. On information and belief, Defendant's actions represented a specific intent to induce infringement of at least claim 9 of the '451 Patent. For example, Defendant offered its dealers and/or customers extensive customer support, instructions, marketing and sales materials, test drives, service, financing, and support that instructed and encouraged its customers to obtain and use the Accused Instrumentalities in an infringing manner, including inducing actions that constitute direct infringement of claim 9 of the '451 Patent.

215. As a result of Defendant's infringement of the '451 Patent, Plaintiffs have suffered and are owed monetary damages adequate to compensate them for the infringement under 35 U.S.C. § 284, but in no event less than a reasonable royalty.

216. In addition, Defendant's infringing activities detailed in this Complaint have been willful, egregious, wanton, and deliberate in disregard to Plaintiffs' rights, justifying a finding of willful infringement, enhanced damages under 35 U.S.C. § 284, and attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT V – INFRINGEMENT OF THE ’212 PATENT

217. Plaintiffs incorporate herein the allegations made in paragraphs 1 through 184.

218. Defendant has directly and/or indirectly infringed, and continues to directly and/or indirectly infringe, one or more claims of the ’212 Patent, including, for example, claim 13, in violation of 35 U.S.C. § 271(a) and/or (b) by making, using, selling, offering for sale, and/or importing into the United States the Accused Instrumentalities.

219. An exemplary claim chart demonstrating Defendant’s infringement of the ’212 Patent, as well as Defendant’s customers’ infringement of the ’212 Patent, which has been induced by Defendant, is attached as Exhibit 13 and incorporated herein by reference.

220. Additionally, Defendant has indirectly infringed, and continues to indirectly infringe, the ’212 Patent in violation of 35 U.S.C. § 271(b) at least by inducing dealerships and customers to purchase, demonstrate, test, and/or use the Accused Instrumentalities in a way that directly infringes at least claim 13 of the ’212 Patent.

221. On information and belief, despite Defendant’s knowledge of the ’212 Patent and of its infringement of the ’212 Patent, Defendant has not sought to remedy

its infringement or sought to identify any good faith belief as to why it does not infringe the ’212 Patent.

222. On information and belief, Defendant’s actions represented a specific intent to induce infringement of at least claim 13 of the ’212 Patent. For example, Defendant offered its dealers and/or customers extensive customer support, instructions, marketing and sales materials, test drives, service, financing, and support that instructed and encouraged its customers to obtain and use the Accused Instrumentalities in an infringing manner, including inducing actions that constitute direct infringement of claim 13 of the ’212 Patent.

223. As a result of Defendant’s infringement of the ’212 Patent, Plaintiffs have suffered and are owed monetary damages adequate to compensate them for the infringement under 35 U.S.C. § 284, but in no event less than a reasonable royalty.

224. In addition, Defendant’s infringing activities detailed in this Complaint have been willful, egregious, wanton, and deliberate in disregard to Plaintiffs’ rights, justifying a finding of willful infringement, enhanced damages under 35 U.S.C. § 284, and attorneys’ fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## <u>COUNT VI – INFRINGEMENT OF THE ’829 PATENT</u>

225. Plaintiffs incorporate herein the allegations made in paragraphs 1 through 184.

226. Defendant has directly and/or indirectly infringed, and continues to directly and/or indirectly infringe, one or more claims of the '829 Patent, including, for example, claim 1, in violation of 35 U.S.C. § 271(a) and/or (b) by making, using, selling, offering for sale, and/or importing into the United States the Accused Instrumentalities.

227. An exemplary claim chart demonstrating Defendant's infringement of the '829 Patent, as well as Defendant's customers' infringement of the '829 Patent, which has been induced by Defendant, is attached as Exhibit 14 and incorporated herein by reference.

228. Additionally, Defendant has indirectly infringed, and continues to indirectly infringe, the '829 Patent in violation of 35 U.S.C. § 271(b) at least by inducing dealerships and customers to purchase, demonstrate, test, and/or use the Accused Instrumentalities in a way that directly infringes at least claim 1 of the '829 Patent.

229. On information and belief, despite Defendant's knowledge of the '829 Patent and of its infringement of the '829 Patent, Defendant has not sought to remedy its infringement or sought to identify any good faith belief as to why it does not infringe the '829 Patent.

230. On information and belief, Defendant's actions represented a specific intent to induce infringement of at least claim 1 of the '829 Patent. For example,

Defendant offered its dealers and/or customers extensive customer support, instructions, marketing and sales materials, test drives, service, financing, and support that instructed and encouraged its customers to obtain and use the Accused Instrumentalities in an infringing manner, including inducing actions that constitute direct infringement of claim 1 of the ’829 Patent.

231. As a result of Defendant’s infringement of the ’829 Patent, Plaintiffs have suffered and are owed monetary damages adequate to compensate them for the infringement under 35 U.S.C. § 284, but in no event less than a reasonable royalty.

232. In addition, Defendant’s infringing activities detailed in this Complaint have been willful, egregious, wanton, and deliberate in disregard to Plaintiffs’ rights, justifying a finding of willful infringement, enhanced damages under 35 U.S.C. § 284, and attorneys’ fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT VII – INFRINGEMENT OF THE ’289 PATENT

233. Plaintiffs incorporate herein the allegations made in paragraphs 1 through 184.

234. Defendant has directly and/or indirectly infringed, and continues to directly and/or indirectly infringe, one or more claims of the ’289 Patent, including, for example, claim 6, in violation of 35 U.S.C. § 271(a) and/or (b) by making, using,

selling, offering for sale, and/or importing into the United States the Accused Instrumentalities.

235. An exemplary claim chart demonstrating Defendant's infringement of the '289 Patent, as well as Defendant's customers' infringement of the '289 Patent, which has been induced by Defendant, is attached as Exhibit 15 and incorporated herein by reference.

236. Additionally, Defendant has indirectly infringed, and continues to indirectly infringe, the '289 Patent in violation of 35 U.S.C. § 271(b) at least by inducing dealerships and customers to purchase, demonstrate, test, and/or use the Accused Instrumentalities in a way that directly infringes at least claim 6 of the '289 Patent.

237. On information and belief, despite Defendant's knowledge of the '289 Patent and of its infringement of the '289 Patent, Defendant has not sought to remedy its infringement or sought to identify any good faith belief as to why it does not infringe the '289 Patent.

238. On information and belief, Defendant's actions represented a specific intent to induce infringement of at least claim 6 of the '289 Patent. For example, Defendant offered its dealers and/or customers extensive customer support, instructions, marketing and sales materials, test drives, service, financing, and support that instructed and encouraged its customers to obtain and use the Accused

Instrumentalities in an infringing manner, including inducing actions that constitute direct infringement of claim 6 of the ’289 Patent.

239. As a result of Defendant’s infringement of the ’289 Patent, Plaintiffs have suffered and are owed monetary damages adequate to compensate them for the infringement under 35 U.S.C. § 284, but in no event less than a reasonable royalty.

240. In addition, Defendant’s infringing activities detailed in this Complaint have been willful, egregious, wanton, and deliberate in disregard to Plaintiffs’ rights, justifying a finding of willful infringement, enhanced damages under 35 U.S.C. § 284, and attorneys’ fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues triable of right by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

a. A judgment that Defendant has directly and/or indirectly infringed one or more claims of each of the Patents-in-Suit either literally or under the doctrine of equivalents;

b. A judgment requiring Defendant to pay Plaintiffs damages under 35 U.S.C. § 284 for their past, present, and future infringement, as applicable, of each of the Patents-in-Suit, including an accounting for any sales or damages not presented at trial;

c. A judgment and order that Defendant has willfully infringed the Patents-in-Suit and requiring Defendant to pay Plaintiffs enhanced damages under 35 U.S.C. § 284 and attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285;

d. A judgment that Defendant account for and pay to Plaintiffs a reasonable, ongoing, post-judgment royalty for any continuing infringing activities not already accounted for;

e. A permanent injunction enjoining Defendant and its officers, agents, representatives, assigns, licensees, distributors, employees, related entities, and all those acting in privity or in concert with Defendant from further infringement of the Patents-in-Suit;

f. A judgment and order requiring Defendant to pay Plaintiffs prejudgment and post-judgment interest on the damages awarded;

g. A judgment and order requiring Defendant to pay Plaintiffs' costs; and

h. Such other and further relief as the Court may deem just and proper.

Dated: November 18, 2026

Respectfully submitted,

*/s/ Timothy E. Grochocinski*
Timothy E. Grochocinski
Illinois Bar No. 6295055
tim@nelbum.com
Taryn N. Trusty
Illinois Bar No. 6344409
taryn@nelbum.com
NELSON BUMGARDNER
CONROY PC
745 McClintock Drive, Suite 340
Burr Ridge, Illinois 60527
708.675.1974 (telephone)

Brent Bumgardner
Texas Bar No. 00795272
brent@nelbum.com
NELSON BUMGARDNER
CONROY PC
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
817.377.9111 (telephone)

Dean W. Amburn
Michigan Bar No. P46427
dwa@amburnlaw.com
Amburn Law PLLC
2001 15th Street
Detroit, Michigan 48216
313.612.2111 (telephone)

*Attorneys for Plaintiffs*
*Malikie Innovations Ltd. and*
*Key Patent Innovations Ltd.*